Daniel, J.
The reversal of the judgment is asked mainly upon the argument that the ascertainment of the quantity of the wheat by weighing it, as also the ascertainment of the correspondence between the bulk and the sample, were conditions precedent to the vesting of the property; and that as the wheat was accidentally destroyed by fire before the appellants had an opportunity of ascertaining its quantity and quality in *441 the mode prescribed by the contract, the loss ought not to have been visited upon them, but should have been left to be borne by the appellee:.
I shall first examine how far the case is affected by the consideration that the wheat at the time of the loss had not been weighed by the appellants; and, secondly, how far it is affected by the consideration that the bulk had not yet been compared by them with the sample.
And proceeding to dispose of these questions in their order, it must be conceded that the authorities furnish numerous instances in which the rules in respect to the first question are stated in a manner favorable to the views of the appellants.
Thus, Mr. Blackburn, in his treatise on the Contract of Sale, at p. 151-2-3, after stating that where the agreement is for the sale of goods and also the performance of other things, the courts have adopted certain rules of construction for the purpose of ascertaining whether the performance of any of those things is meant to precede the vesting of the property, proceeds to say, “ These rules, of which there is no trace in the reports before the time of Lord Ellenborough, are laid down, since the time of that learned judge, as rules of English law, in terms nearly equivalent to those in which they are laid down as rules of the civil law. They are two-fold: the first is, that where by the agreement the vendor is to do any thing to the goods for the purpose of putting them into that state in which the purchaser is bound to accept, or as it is sometimes worded, into a deliverable state, the performance of those things shall (in the absence of circumstances indicating a contrary intention) be taken to be a condition precedent to the vesting of the property. The second is, that when any thing remains to be done to the goods for the purpose of ascertaining the price, as by weighing* measuring or testing the *442 goods, where the price is to depend on the quantity or quality of the goods; the performance of those things also shall be a condition precedent to the transfer of the property, although the individual goods be ascertained, and they are in the state in which they ought to be accepted.”
He then proceeds to discuss the reasons of the rules; and in respect to the first he says, “ It seems to be founded in reason. In general, it is for the benefit of the vendor that the property should pass; the risk of loss is thereby transferred to the purchaser; and as the vendor may still retain possession of the goods so as to retain a security for payment of the price,' the transferrence of the property is pure gain. It is therefore reasonable, that where by the agreement the vendor is to do something before he can call upon the purchaser to accept the goods as corresponding to the agreement, the intention of the parties should be taken to be that the vendor was to do this before he obtained the benefit of the transfer of the property. The presumption does not arise if the things might be done after the vendor had put the goods in the state in which he had a right to call upon the purchaser to accept them, and would be unreasonable where the acts were to be done by the buyer who would thus be rewarded for his own default.” “ The second rule (however he proceeds) seems to be adopted, somewhat hastily, from the civil law, without adverting to the great distinction made by the civilians between a sale for a certain price in money and an exchange for any thing else. The English law makes no such distinction, but, as it seems, has adopted the rule of the civil law, which seems to have no foundation except in that distinction. In general, the weighing, &c. must, from the nature of things, be intended to be done before the buyer takes possession of the goods ; but that is quite a different thing from intending it to be done before *443 the vesting of the property; and as it must in general be intended that both the parties concur in the act of weighing when the price is to depend upon the weight, there seems little reason why, in cases in which the specific goods are agreed upon, it should be supposed to be the intention of the parties to render the delay of the act in which the buyer is to concur, beneficial to him. Whilst the price remains unascertained, the sale is clearly not for a certain sum of money, and therefore does not come within the civilian’s definition of a perfect sale, transferring the risk and gain of the thing sold; but the English law does not require that the consideration for a bargain and sale should be in moneys numbered, provided it be of value. Still both branches of the rule (he adds) seem to be now firmly established, though, as ,has been already stated, only within the last half century, and then, it seems, adopted directly from the civil law.”
The second rule as above stated, it cannot be denied, lays down the law as contended for by the appellants. It will be seen, however, on looking into the cases referred to by the author, as establishing the rule, that, in no one of them had there been any actual change in the possession of the goods; that in the three cases of Rugg v. Minett, 11 East’s R. 210; Zagury v. Furnell, 2 Camp. R. 240; and Simmons v. Swift, 5 Barn. & Cres. 857, 12 Eng. C. L. R. 388; on which he mainly relies as illustrations of the rules, the acts of measuring, counting and weighing, by the terms of the agreement, or the usages of the trade, were to be done either by the seller alone, or by him and the buyer concurrently ; and that in neither one of these cases do the judges use any expression from which the inference can be fairly drawn, that they would have held the measuring, counting or weighing as necessary precedents to the vesting of the property, if by the terms *444 of the agreement those acts had been left to be performed by the buyers alone.
In the first case, Lord Ellenborough said, the true enquiry was, “ whether every thing had been done by the sellers, which lay upon them to perform, in order to put the goods in a deliverable state.” And Bayley, J. said, that “if the sellers meant to relieve themselves from all further responsibility, they should have done what remained for them to do; and until that was done, the property remained in them.” In the second, Lord Ellenborough said, that “ as the enumeration of the skins was necessary to ascertain the price, this was an act for the benefit of the seller; and as the act remained to be done when the fire happened, there was not a complete transfer to the purchaser; and the skins continued at the seller’s risk.” And it was proved in that case, that the custom was for the seller to count the skins, to see that each bale had its complement, before delivery. And in the third case, Bayley, J. said, that “ generally speaking, where a bargain is made for the purchase of goods, and nothing is said about payment on delivery, the property passes immediately, so as to cast upon the purchaser all future risks, if nothing further remains to be done to the goods, although he cannot take them away without paying the price.” And he further 'explains himself, by immediately adding, “ If any thing remains to be done oil the part of the seller, until that is done the property is not changed.” That the latter remark was intended as a qualification of what he had said previously, is rendered obvious, by his opinion delivered the year afterwards, in the case of Tarling v. Baxter, 6 Barn. & Cres. 360, 13 Eng. C. L. R. 159, in which he says, “ The rule of law is, that where there is an immediate sale, and nothing remains to be done by the vendor, as between him and the vendee, the property *445 in the thing sold vests in the vendee; and then all the consequences resulting from the vesting of the property follow; one of which is, that if it be destroyed, the loss falls upon the vendee.” And the remarks of Holroyd, J. in the same case, were to the same effect. Whilst, therefore, there appears to my mind to be great force in the reasons assigned by Mr. Blackburn against the adoption of the second of the rules stated by him, it seems to me also, that he has in fact stated the rule in terms broader than the decisions and opinions to which he refers as having established it, will justify.
There are, however, among the many cases cited by the counsel for the appellants, several, as for instance, Ward v. Shaw, 7 Wend. R. 404; Andrew v. Dieterick, 14 Wend. R. 31; and Logan v. Le Mesurier, 6 Moore P. C. C. 116; in which the rule upon the subject is stated to be as they contend it is.
Still, there is, I think, a decided preponderance of authority in favor of the proposition, that where the subject matter of the contract has not only been completely ascertained and identified, but actually delivered, the mere fact that the weighing, counting or measuring, is yet to be done by the buyer, in order simply to ascertain the aggregate sum of money which he is to pay as the price, does not of itself show such a defect in the transfer of the title as will prevent the risk of loss from being cast on the buyer. Selwyn’s Nisi Prius 1054; 2 Kent’s Comm. 675-6; Sumner v. Hamlet, 12 Pick. R. 76; Macomber v. Parker, 13 Pick. R. 176; Riddle v. Varnum, 20 Pick. R. 280; Morgan v. Perkins, 1 Jones’ (Law) N. C. R. 171; Tyler v. Strang, 21 Barb. S. C. R. 198; Crofoot v. Bennett, 2 Comst. R. 258; Page v. Carpenter, 10 N. Hamp. R. 77; and Cunningham v. Ashbrook, 20 Missouri R. 555. Of these cases, the last will be more especially noticed, as from the character of the facts it will be seen to be directly in point. It was the sale of an entire drove of hogs *446 at a stipulated price per cwt. net weight, to be delivered at the slaughter-house of the buyer, who was to kill and weigh them. The hogs were delivered and slaughtered, and the seller notified that he might call the next day at the packing-house of the buyer, see the hogs weighed, and get his pay. That night, however, the slaughter-house was burned down, and the hogs consumed by the fire.
In the course of the opinion of the court, delivered by Leonard, Judge, sustaining the right of the seller to recover the price, the following principles, amongst others, were asserted, viz: That the rule, that in a sale of goods, no title passes while any act, such as counting, weighing or measuring remains to be done by the seller, is only applicable when such act is necessary to separate the goods from a larger mass, and does not apply to a sale upon fixed terms by weight, to be subsequently ascertained, of goods already separated; in which case, the title passes by the delivery; and as a consequence, the loss, by a destruction of the goods after they are delivered and before they are weighed, will fall upon the buyer. That although there is no sale till the price is settled, yet it is settled in the meaning of the rule, when the terms are so fixed that the sum to be paid can be ascertained by weighing, without further reference to the parties themselves; and that in a case of the kind, a jury would be at liberty to infer from a change of the possession, that the delivery was intended for the purpose of passing the property. “It is true (the judge said), that in determining the question as to the purpose of the parties in changing the actual possession, the fact that the price is to be subsequently ascertained by reference to the net weight, and then paid, is proper to go to the jury; but possession is so much of the essence of property, as it is that alone which enables us to enjoy a thing as property, and the natural connection between *447 property and possession, especially in movables, is so strong, that the presumption arising from a change of actual possession, that it was intended also as a change of the property, is not overcome as a matter of law by the fact that the thing bargained for was to be paid for by weight, to be ascertained after the delivery.”
The effect of an actual change of possession upon the question is very clearly and strongly stated in the opinion of the court in Macomber v. Parker. It is there said, “The general principle is, that where an operation of weight, measurement or the like, remains to be performed in order to ascertain the price, the quantity or the particular commodity to be delivered, and to put it in a deliverable state, the contract is incomplete until such operation is performed. Brown on Sales 44. But where the goods or commodities are actually delivered, that shows the intent of the parties to complete the sale by the delivery; and the weighing or measuring or counting afterwards would not be considered as any part of the contract of sale, but would be taken to refer to the adjustment of the final settlement of the price. The sale would be as complete as a sale upon credit before the actual payment of the price.”
In the case of Scott v. Wells, 6 Watts & Serg. R. 357, Gribson, C. J. uses certain expressions in the course of his opinion, which seem to lean in favor of the pretensions of the appellants here. But on comparing the facts upon which the judgment in that case was founded, with the facts in this case, the decision will be seen to be one which may be very properly added to the list of cases already cited as sustaining the cause of the appellee.
The only reported cases decided by this court, in which it has become necessary to examine the principles bearing upon the question under consideration, are those of Pleasants v. Pendleton, 6 Rand. 423; Camp *448 bell v. Chapman, 13 Gratt. 105; and Dixon v. Myers & Co. 7 Gratt. 240. In none of these cases was the precise question before us decided: though in all it was necessary to consider to some extent that branch of the law under which it arises. In the first two, nothing was decided which can make in favor of the appellants. On the contrary, so far as they bear on this case, they are in favor of the appellee. In the last (Dixon v. Myers), which of the three most closely resembles this in the facts, it is true there is, in the opinion of the court, delivered by myself, a statement of the law, which, if taken alone, without reference to the special facts of the case, and unexplained by subsequent portions of the opinion, might seem to commit the court to the adoption of the second rule laid down by Mr. Blackburn. But when this reference is had and the opinion is taken as a whole, it will, I think, be seen that the case is one which cannot be regarded as an authority for the appellants. The contract there was for the purchase of an article yet to be prepared. By the terms of the agreement, Dixon was to take, at a certain price per cwt., all the stems which Myers & Co., who were manufacturers of tobacco, should prize during the year, with the exception of fifteen or twenty hogsheads, which Myers & Co. reserved the right to send to another person. Myers & Co. were to prize the stems in hogsheads, set them apart for the buyer in their store-room, weigh them and mark them, and then to present their bills and to receive their pay. Seventeen hogsheads had been set apart under the reservation just mentioned, and fifty-six hogsheads, for the price of which the suit was brought, had been prized and stored away: and a short time before the fire the agent of Dixon was at the factory, and in company with one of the superintendents in the establishment, counted them ; and then urged this superintendent to press on the work as rapidly as he could, as *449 he wished one hundred hogsheads ready by Christmas. The fifty-six hogsheads, however, were not weighed or marked at the time of the fire.
It will be seen thus, that that case differs from this in several important particulars. There, there had been no actual change in the possession and custody of the thing bargained for. The weighing by the terms of the contract was to be done by the seller; and was not only an act necessary to be performed in order to ascertain the price, but in connection with the marking was necessary to the complete designation and identification of the property as the property of the buyer, and to the placing it in that state in which by the agreement it was to be before the seller could demand its price, or truly notify the buyer that it was then ready for him.
I do not think, therefore, that there is any thing to be found in the reported decisions of this court, which should constrain us to oppose that current of decision which is strongly tending to the re-establishment of the common law rules upon the subject, and which, in the language of the court in Macomber v. Parker, considers such an understanding about the weighing, at least when it is to be done after an actual change of possession, “ not as a part of the contract of sale, but as referring to the adjustment of the final settlement of the price.”
In considering the second question in the case, I do not regard it material to enquire whether the understanding between the parties in respect to the quality of the wheat, is to be regarded in the light of a warranty of the quality, properly so called, or is in connection with the other parts of the negotiation to be taken as an engagement to deliver wheat corresponding in quality with the sample. As the wheat, though in esse at the time of the contract, was not in the condition in which it was to be delivered, and the buyer *450 had then no opportunity of inspecting, it is, I think, most proper to consider the contract as upon the footing, of an engagement to deliver wheat corresponding in quality with the samples which were exhibited. And this latter view is the one most favorable to the pretensions of the appellants; as in such cases it would seem to be settled that if the goods do not correspond with the sample shown, the buyer may refuse to receive or pay for them. Wells v. Hopkins, 5 Mees. & Welsb. 7; Mondel v. Steel, 8 Id. 858; and 1 Smith’s Leading Cases, note 257. In their note to the case of Chandelor v. Lopus, the American annotators state as the result of the numerous authorities which they cite on the subject, that “ the rule which governs sales by samples is a mere application of the general and obvious principle, that in order to fulfill a contract of sale, the vendor must deliver that which he has agreed to selL; and if he does not, the vendee may either rescind the contract altogether and return the goods, or receive them, and claim a sufficient deduction from the purchase money to make up the loss occasioned by their inferiority, in absolute or relative value.” Conceding this to be a correct statement of the rule, I do not perceive how it tends to establish in any manner the point at which, in the performance of a contract for the sale and delivery of goods, the law shifts the risk of loss from the seller to the buyer.
It is essential to the force and efficacy of every contract of sale, that the buyer and seller should mutually contemplate the same subject matter of sale; and all the rules prescribing the acts and ceremonies essential to a transfer of the title of the property and of the risks attaching to the ownership, proceed necessarily upon the supposition that such acts and ceremonies have been done and performed about the subject of the contract. When a merchant orders goods of a certain kind or style to be forwarded to him by a carrier, and *451 the party to whom the order is given undertakes to fill it by delivering to the carrier goods of a diiferent kind or style, the merchant ordering the goods may refuse to receive them, not because a delivery to a carrier, in pursuance of a contract for the sale of goods, is not such delivery as changes the property so as to cast the risk of loss on the buyer, but because the goods delivered are not the goods ordered. If in such a case the goods are lost after the delivery to the carrier, but before they reach the hands of the buyer, the seller would be defeated in any action he might bring for the price, not because of the want of completeness in the execution of his contract, but because of the want of any contract at all in relation to the goods delivered. It is true, that if the buyer, notwithstanding the want of correspondence between the goods ordered and sent, accepts the latter and treats them as a compliance with his order, he cannot after-wards, as a general rule, set up any want of correspondence, in defeat of the seller’s right to recover the price. But this does not go to show that where the goods ordered and the goods sent are the same, an acceptance by the buyer is essential to complete the bargain. On the contrary, if in such a case he refuses to accept, the authorities are clear, that the rights and remedies of the seller are just as complete as if there had been a full and formal acceptance. The authorities to which I have referred seem to place a want of correspondence in respect of quality, in sales by sample, on the same footing with a want of correspondence in respect of the kind of goods, and to allow to the buyer the like right to reject the goods and refuse to pay for them in both cases. This makes it incumbent on the seller, in all cases of the kind, where there has not been an acceptance by the buyer, to prove the correspondence in quality between the sample and the article he contracts to sell by it. But *452 when he does this, and shows also that he has performed those acts which, in executory contracts for the sale of goods, usually denote the transfer of the property in the thing contracted for, he satisfies fully the very terms of his contract, and occupies, in respect of the question of risk and loss, the same position that he would have occupied had there been no implied warranty or agreement in regard to the quality of the goods.
It is true, that where the contract is for a sale, on trial, or if the goods shall suit the taste of the buyer, the contract is not executed till the buyer has had an opportunity to try or taste. But the difference between such cases and a mere sale by sample, is too obvious to require explanation. There is nothing in the facts of this case to furnish a pretext for the idea that the appellants were to be the sole and exclusive umpires of the quality of the wheat, and were to have the arbitrary right to reject the wheat, if upon comparing the bulk with the sample it did not suit their views in respect to the quality. The true nature of the agreement, implied from a sale in reference to samples exhibited at the time of the sale, is not that the buyer is to have the right of deciding whether there is a correspondence between the bulk and the sample, but that there shall in fact be such correspondence.
We have no reported case in this court bearing directly on this question; but the unreported case of Haxall, &c. v. Barbour, decided by this court at its October term in the year 1851, is directly in point, not only on this question, but also on the other question in this case. The only material difference in the two cases consists in the fact that there the sale was of an entire parcel of wheat, which at the time was in the depot of the Richmond, Fredericksburg and Potomac rail road company, and which was open to *453 the inspection of the Haxalls, if they chose to inspect before receiving the wheat; whilst here the contract is for the sale of an entire crop which at the time was not ready for delivery, being in the chaff; and which the appellee, by her agent, contracted to transport from her barn and deliver to the Central rail road company, at their G-ordonsville depot, to be carried to the Haxalls at Richmond.
The first was, strictly speaking, a contract of sale, whilst this was an executory contract for the sale of wheat. But it needs no argument to show that so soon as Mrs. Willis had separated the wheat from the chaff, transported it to Gordonsville, and there delivered it to the carrier agreed on between the parties, she occupied the same position as Barbour did in his case, when he had concluded the negotiation and given the Haxalls his order for the wheat. If not so, the similarity in the two cases becomes most obvious, from the time when the wheat in the present case had reached the depot in Richmond, and the Haxalls had in fact received a portion of the wheat, and carried it .to their mills. The two cases plainly call for like judgments.
It is argued, however, that, as the case of Haxall, &c. v. Barbour was decided by a court consisting of three members only, and has never been reported, this court has not such strong reasons for adhering to it as a decision as it would have had, had the case been decided by a full court, and reported as a precedent. Whilst this is so, it is yet proper to state that that case was very fully and ably argued, was maturely considered by the court, and decided without any dissent; it was also selected as a case proper to be reported $ and the absence of a report of the case is due entirely to the lamented death of Judge Baldwin, the member of the court to whom had been assigned the task of preparing the opinion of the court. Whilst, therefore, *454 the case has been very properly regarded as not concluding the discussion and examination of the principles upon which it must have been decided, this court could not properly treat it as entitled to no weight in passing upon questions about which there is a conflict of authority. It is but proper to add also, that the case now before us has been twice argued here; on a former occasion before a court consisting of three judges, who upon conferring on the case, were unanimously of opinion to affirm the judgment; and now before a court consisting of four judges, who, upon a conference, have unanimously arrived at the same result.
Under these circumstances, whilst, owing to the conflict of the authorities and the diversity in the reasoning of judges and courts declaring the same principles, I have experienced much embarrassment and difficulty in stating, in a manner satisfactory to myself, the grounds on which to rest the ease, I yet feel confident in the belief that the right and justice of the case will be attained by affirming the judgment.
The other judges concurred in the opinion of Daniel, J.
Judgment affirmed. .
Note. — The following case of Haxall, Brothers & Co. v. Barbour was decided at the October term 1851 of this court, and is referred to by Judge Daniel, in his opinion in the foregoing case of Haxall v. Willis:
This was an action on the case in the Circuit court of law for the county of Henrico, brought in March 1850, by Benjamin Johnson Bar-hour against Haxall, Brothers & Co. to recover the price of certain wheat which th,e plaintiff alleged he had sold to the defendants. The parties agreed to dispense with a jury, and to submit the case to the court. Upon the trial the following facts were proved:
The plaintiff sent to Deane & Brown, commission merchants in the city of Richmond, by the Richmond, Fredericksburg and Potomac rail road, three hundred and seven bags of wheat, to be sold by them for *455 him. Each bag contained more than two bushels of wheat, though the excess above two bushels was not uniformly the same. On Saturday the 22d of December 1849, between the hours of eleven and twelve o’clock in the forenoon, Deane & Brown offered the wheat for sale to the defendants, who were millers in the city of Richmond, exhibiting to them at the time a fair sample of the wheat, which was then in the depot of the rail road company in the city of Richmond, open to the inspection of the defendants, if they chose to inspect it; and the defendants agreed to purchase it at the price of one dollar for each bushel of sixty pounds; and thereupon Deane & Brown gave to the defendants an order in writing, addressed to the agents of the rail road company at the depot, requiring them to deliver the whole of the said wheat to the defendants; which order the defendants received and filed with the agents of the rail road company at the depot. The sale was intended to be a cash sale, but nothing was said at the sale of the time of payment or of the removal of the wheat from the depot, except a remark by the vendor to the vendee that he hoped he would get the wheat away from the depot as soon as possible. This remark was occasioned by the consideration that it was not usual in Richmond to send in a bill for the price of the wheat sold to a miller until it had reached the mill, and that the vendor intended to leave the city on the following Monday. And the vendees’ reply to the remark was, that they had a good deal of wheat in the same depot, which they wished to get away by noon on the following Monday, which would be the day before Christmas, and did not think they could get it away sooner.
According to the usage of the trade in Richmond in such cases, which was well understood by the parties, and with reference to which they contracted, the vendor of wheat in the depot, after he gives a delivery order to the vendee, parts with all control over it; and as soon as the order is filed with the depot agent, he holds the same subject to the order of the vendee, and would not deliver it to the order of the vendor, or any one else except the vendee.
The wheat is removed from the depot by the vendee to his mill, the transportation being at his expense and risk; it is there inspected by the vendee, to see if it corresponds with the sample, when the sale is by sample; and if it does not correspond, the vendee has the right to refuse to take it and execute the contract: if it does correspond, then the vendee is bound to take it; and it is then weighed at the mill, and settled for by the miller’s weights: and the vendee does not give a final receipt for the wheat or pay for the same until it has been inspected and weighed at his mill.
It was further proved, that the agents at the depot considered the wheat the property of the defendants from the time of the filing of the delivery order at the depot, which was done between 12 and 1 o’clock on Saturday; and the agents of the vendor considered themselves as having no further control of or responsibility for the wheat after the delivery of the order aforesaid; but no time was specified for the removal of the wheat from the depot. The depot was consumed by fire on *456 the night of Sunday, the next day, and the three hundred and seven bags of wheat aforesaid wore consumed in it.
Prior to and at the time of the purchase of the plaintiff’s wheat by the defendants, they had a large quantity of wheat in the said depot, which they had been notified by the agent at the depot to remove, because it encumbered the depot and prevented the delivery of other wheat. They kept in their employment a special carrier to haul their wheat from the depot, and no wheat subject to their order would be delivered to any other carrier, unless their regular carrier was unable to carry it. The defendants had twelve wagons employed in hauling wheat from the depot on Saturday the 22d of December 1849, which were able to make only twelve loads, because there was so much other wheat in the depot beside that subject to the order of the defendants, which was in the course of delivery on that day, that the hands and agents at the depot were not able to deliver more than the twelve loads aforesaid to the wagons of the defendants, though the said wagons could have made eighty loads if promptly loaded.
Upon the trial, the court rendered a judgment for the plaintiff for six hundred and fourteen dollars, with interest thereon at six per cent, from the 27th day of December 1849 till paid, and his costs. And thereupon, the defendants excepted; and applied to this court for a supersedeas; which was awarded.
Steger and Maefarland, for the appellants.
Lyons, for the appellee.
The judgment of the Circuit court was unanimously affirmed.